will be case number 22-1680, Scott Stouffer v. Transtar LLC, Union Railroad, U.S. Steel, and Smart Transportation Division. Mr. Segura, Your Honor. Mr. Segura, please. Good morning, Your Honors. If I could have five minutes for rebuttal. Please, by all means. May it please the Court, Sammy Segura on behalf of the appellants. We did raise two issues on appeal, but I know that the Court was interested specifically on the Railway Labor Act preclusion issue. Yes. So the appellant's position is quite simple. Given the nature of the claims that are being appealed at this Court, which are disparate impact rather than disparate treatment, our position is that all of the arguments that have been raised so far by Dapolese, but also controlling case law, should take into consideration that the Railway Labor Act does not preclude these claims. Okay. Now, when we're looking at jurisdiction, we look at the source of the right and the need to interpret the collective bargain agreement. I don't know if you think there are any other factors we should consider, but other circuits seem to lean on those too. If those are the right two factors, the source of this right is the ADA, right? AD, sorry, ADEA. Yes, Your Honor. Okay. And then the need to interpret the collective bargaining agreement. How does the collective bargaining agreement figure into these claims? It doesn't, Your Honor, and that's the issue. That's the main issue as to why the Railway Labor Act should not preclude these claims. If we're looking at the documents and the purpose of the Railway Labor Act, the whole point is to provide stability in labor negotiations, but also provide a conclusive framework for dealing with these issues so that these cases don't have to go to court. In our position, the CBA does not mention the demerit issue, which is part of our allegations, but also, as you'll see in terms of the documents that have been provided by both parties, and it is specifically the supplemental appendix, the demerit policy specifically says that it is not part of the collective bargaining agreement. So that's an issue, and I believe that starts around Appendix 166, around that page. But that's the biggest issue here, Your Honor, is that because those documents don't specifically address both the ADEA, which are the federal minimum age discrimination claims, and also the manner in which appellants were terminated, that's an issue. And I believe because of that, that there is no preclusion. What do you say to, you know, the supplemental brief from Union Railroad and other appellees says there are 14 ways the collective bargaining agreement may or might need to be interpreted to resolve these claims. What do you say in response to that? Those are all convincing or might be more compelling, Your Honor, if we're dealing with disparate treatment. So all of those arguments specifically address whether or not there were pretextual reasons to terminate appellants and any of the putative class numbers. But again, we're focused on disparate impact treatment, and the focus on those types of claims is whether or not there's a facially neutral policy, if it was applied, and when applied, did it disproportionately impact a protected category of individuals. In this instance, we're talking about individuals or employees who are 40 years of age or older. That's it. So all of their reasons go back to the issues that we didn't bring up on appeal before this course. Disparate treatment, again, is distinguished from disparate impact on the specific issue. And again, it's the main reason why there should not be preclusion, because all of the courts agree on this, that there should be federal substantive minimum floor rights that are available, especially under the ADA. If we agree with you on jurisdiction, I don't know if Judge Fuentes has any more questions on jurisdiction. It seems you've got some problems on the merits here. You run smack it to haze and paper versus biggins. It doesn't violate the ADA to fire workers whose benefits are about to vest. Your Honor, but again, we're focused on the disparate impact. I think that the focus on the district court decision, which muddles the two theories, is that motivation, which again goes to disparate treatment, should be distinguished from disparate impact, which again, is just the application of a facial neutral policy. And do we have the information to get past the pleading stage, which is... Okay, so you think you can get around haze and paper as a disparate impact claim? Yes, Your Honor. But Stouffer was under 40 when the alleged targeting began. But he was over 40 when he was fired, Your Honor. Okay. But we've said to make a disparate impact claim, you have to proffer statistical evidence that the policy, the challenge policy, caused a significant age-based disparity. Now, where did you do that? Specifically in the causes of action under count two, Your Honor. We did say that there was a disproportionate impact on that. And then also on page... I apologize. I believe it would have been page 60. But there was a section under the second amended complaint in which we specifically alleged subparagraphs, at least A through F. We noted multiple instances in which they were disproportionately impacted based upon age. Again, this is a reference in the second amended complaint. Right. You've got a paragraph in there, paragraph 121, says it was in a statistically significant way that it affected older employees. But where in the complaint is there sufficient factual matter that you've alleged to back that up? Your Honor, at this time in the second amended claim, apart from those and kind of again alleging towards the percentage, there probably isn't any other additional information. Okay. So probably an equal or far more than that. For disparate impact, Your Honor, I think that we've satisfied at least the controlling case law in the Third Circuit as it relates to disparate impact. And again, I think if we go to appendix page 50, which provides a little bit more details on the subparagraphs and the disparate impact claims, we believe that we've alleged enough to get past the pleading stage. Even if we didn't, Your Honor, we do have factual basis that we believe that we should be given an opportunity to amend one last time on this issue. We do think that the case law... Previously amended. Yes, Your Honor. Okay. So at this point, you know, you don't have an amendment as a right. There's a question about futility. What factual material are you going to add that will get you over the Twombly-Iqbal, you know, pleading with sufficient specificity requirements? We do have documents, if I may be able to discuss those, but those aren't part of the record. But we do have documents that we'd be able to detail that there was a list of older employees that was about 130 individuals. Did you submit that request to the district court? No, Your Honor. We did not. You did not request to amend on these grounds? No, Your Honor. We did not. Okay. Why not? Your Honor, we thought that we had sufficiently pled under the current controlling law, so that we thought that it was sufficient at that point in time. But also because if we put forth a specific document, it could also limit us at this point in time. Because again, our putative potential class spans from potentially 2013 to 2019 or 2020. So if we put forth a specific document that narrows our window in time, it could also bar us from helping other individuals who might have been impacted by the application of these policies. So we think that at least for the ADEA claims, in controlling law, and it's distinguishable from other employment law claims, Your Honors, because ADEA claims recognizes kind of the brief window of opportunity to help older employees. So in terms of how collective action claims are handled by the Third Circuit, or the recognition of the procedural standards, we believe it's kind of distinguishable from any other type of employment law claim. So did Scott Stouffer have a hearing, and was he told precisely the rationale for his discharge? Not on the final hearing, Your Honor. Part of the issue is that we allege about these last chance agreements. So if we're talking about the incidences that led to the enactment In other words, he should have been given one more chance, is that? Well that's the dispute, Your Honor. There are these documents where if the employee agrees to a last chance agreement, then they would have forfeited their rights from the collective bargain agreement. What we believe that the facts will show, at least with all the clients that we represent, is that the union employees were forced into these last chance agreements, giving up their right to deal with these issues through the collective bargain agreement. Was he not informed of the reason or rationale for his discharge? Again, if you're referring to the very, very last time, Your Honor, he was not. It was a last chance agreement. So he was told of it, and he was dismissed. It had to do with, I think, running through a sign or something like that? Yes, Your Honor. All right. And that's what ultimately resulted in his discharge? Yes, Your Honor. Did he have a hearing and things like that? I mean, usually you... Not on that incident, Your Honor. He was just discharged? Yes, Your Honor. I see. All right. Had he any problems before that last event? Your Honor, he does have a demerit record, but our contention is that the issuance of the number of demerits for the incidents that he has a written record of are disproportionate, meaning that the number of demerits that he was issued were significantly higher than younger employees. But there was a series of things. He's saying younger employees were in sanction for this, but it's not like he had anywhere close to a spotless record, and this wasn't a single incident. Yes, Your Honor. But if you look at the industry in terms of the employees that we look at for Union Railroad, no one has a spotless record. It really is the reality of the situation in which everyone has a record. It's just a matter of who got the number of demerits for the same type of incidents in this scenario. Had he had incidents before? I mean, the last one that I remember reading, I don't think was the only incident that he had with supervisors. That's correct, Your Honor. All right. Okay. If you have anything else, we'll get you back on the rebuttal. Yes, Your Honor. Mr. Holt? Holt. Correct, Your Honor. Let us know when you're ready. Just a quick question. This was ultimately a district court's decision, is that correct? That's correct, Your Honor. The district court ruled on a 12B1 motion and a 12B6 motion, actually twice, with the first amended complaint, and now this is the second amended complaint, and in both cases found failure to state a claim under 12B6. The district court did find that there was subject matter jurisdiction, and that's, of course, what I'm prepared to talk about as well pursuant to the court's letter. But it ultimately upheld the discharge. Correct. So let's talk about whether there's subject matter jurisdiction under 12B1, and then we'll get to the merits under 12B6. Thank you, Your Honor, and may it please the Court. Again, my name is Thomas M. Pohl. At council table is co-counsel Courtney C. Brennan. We represent the appellees, United States Steel Corporation, Transtar LLC, and Union Railroad Company. And yes, Your Honor, setting the stage briefly for the jurisdiction piece, the court should do, first it should find that there is no federal court subject matter jurisdiction here. And then secondly, and I know we'll get to it, even if it does find there is subject matter jurisdiction, it should do two things. One, the subject matter jurisdiction ruling, I believe, should be narrowly tailored to this case, and I'll address that issue. And second, it should affirm the Rule 12B6 dismissal on both haze and paper grounds and Twombly grounds. All right. So let's talk about what the law is. We don't appear to have ruled precedentially on the appropriate grounds of how Hawaiian Airlines applies to wrongful discharge. Okay? So there's no precedent here as far as we can find. Other circuits seem to focus on what the source of the right is and the need to interpret this collective bargaining agreement. Are those the right factors? Are there any other things we should be considering here? I would agree that those are the right factors. I think it's the source of the right and then the need to interpret the collective bargaining agreement. The source of the right, the Age Discrimination and Employment Act, the source of the right is not in the CBA, correct? Correct, Your Honor. And that's something that I think Hawaiian Airlines and a lot of the other cases address, both with age discrimination cases and also in ADA cases and sex discrimination and so forth, is that you have these independent federal rights and certainly you see, surveying the cases, that some of them are found to be precluded and some are able to continue in federal court. And I think that distinction is because of sort of that second prong, whether there's a need to interpret the CBA. And I think that's where the cases come down and what I think is helpful to this court is, it seems as though all the cases that address discrimination in the various circuits, whether it's age discrimination or some other discrimination, it appears that they essentially say, do we merely have to reference this document and sort of do a ministerial, find a portion of it and do what it says? Or do we have to engage in some sort of interpretation? And if it's some sort of interpretation, that's where the cases are found to be precluded. Now, for one thing, Mr. Segura points out that this demerits policy isn't even part of the CBA and the CBA doesn't reference it. Yes, Your Honor. We have at least two CBAs in play here and I'll touch on that. But to address your question directly first, what I'll call the main collective bargaining agreement, the main CBA, which is at the supplemental appendix beginning at page 7, and that's the document that's well over 100 pages and goes back decades between the union and the railroad. That CBA sets forth rules and policies, including disciplinary matters, investigations, that are part of sort of the overall collective bargaining agreement. The demerits policy, which is a separate document, and that's the demerits policies in the supplemental appendix at page 166. The demerits policy implements and it implements the CBA. Mr. Segura points in the demerits policy to that line that basically says where the two documents are in conflict, the CBA trumps. Mr. Segura points to that to argue that the two documents are truly independent of each other. Was the demerits policy collectively bargained? Your Honor, factually that appears to be unclear because both the demerits policy and the CBA go back decades. The version of the demerits policy that's attached here is the most recent. It's already five years old. But I think looking at the party's disciplinary records. All right. You're not sure about that. But let's say it was part of the agreement. I'm not seeing where the parties are disagreeing about how to interpret it. Mr. Stolfer is saying your clients implemented it with a discriminatory purpose and that seems to depend on the railroad's actions and motives, not on the interpretation of the policy. Well, two things on that, Your Honor. First, I mentioned there's a second collectively bargained for agreement and that's specifically in plaintiff's pleading. That second collectively bargained for agreement appears in the second amended complaint at paragraph 97. And this is also addressed on page 8 of our supplemental brief. And that complaint citation, just for clarity, is at the main appendix, page 54. But paragraph 97 of the complaint, plaintiff affirmatively alleges that the use of last chance agreements is unconstitutional and contractually limited to employees with substance abuse problems. And then goes on to allege that instead the defendants here began to use these LCAs to target senior employees in violation of their agreement. In other words, in violation of the agreement between the union and the railroad as to whether last chance agreements may be used, when they may be used, when they may not be used. So plaintiff has affirmatively alleged that there is a collectively bargained for deal between the union and the railroad about when last chance agreements can be used and can't be used. And plaintiff uses this to argue his scheme. The main scheme is that these last chance agreements were improperly used. He says they were supposed to just be used for drug and alcohol cases and alleges that the railroads were then using them in different contexts and says that this is beyond what the union had agreed to and beyond the scope of that collectively bargained for agreement. So I would point to that specific allegation and plaintiff's own complaint as dispositive here. As what? As dispositive. I'm sorry, Your Honor. The Supreme Court's consolidated rail case, which was the 1989 Supreme Court decision that plaintiff cites in its supplemental brief. That case talked about whether plaintiff's pleading itself is asserting an existing contractual right. And that's what plaintiff is doing here. He's asserting that there's a contractual agreement between the union and the railroad about use of last chance agreements and saying they were improperly used here as part of this nefarious scheme. So in order to litigate that and in order to defend against that allegation, the appellees here will have to litigate what this collectively bargained for agreement about use of last chance agreements, what the terms of that agreement are, what the scope of it is, and then proceeding further in litigation, whether they have appropriately used last chance agreements or have somehow exceeded the bounds of what they had agreed to with the unions. Is there such a thing as a last chance agreement? There is, Your Honor. And actually, Judge Fuentes, addressing a question that you asked opposing counsel, the actual last chance agreement that was implemented with respect to Mr. Stouffer, and again, this was when he was still in his 30s, that actual last chance agreement is at the supplemental appendix at page 173. And that's specifically a last chance agreement that has three parties, three signatories. It's not just Mr. Stouffer and the railroad, but it's Mr. Stouffer signing, the railroad signing, and the union signing. And that, again, is reflective of the fact and the allegation that plaintiff alleges the union collectively bargained for these last chance agreements and said, you know, this is going to be something that is used in connection with disciplinary matters in certain circumstances. And the allegation, again, in the complaint is that part of the scheme was using these agreements outside of what the deal was with the union. That's almost the definition of a minor agreement under Railway Labor Act law that's required to go to arbitration. Could I ask you, you said your primary position was there's no jurisdiction, but your fallback position seems to be if we find subject matter jurisdiction, you think we ought to narrow our finding of it to something specific to this case. Could you tell us about what argument you want to make there? Sure, yes, Your Honor. And that goes to, you know, I said that I think the dispositive issue is this allegation about how last chance agreements were used. But even looking beyond that and returning to the main collective bargaining agreement, the lengthy written one that's at Supplemental Appendix 7, there are a number of allegations going through plaintiff's complaint that in order to address them will require not just reference to the collective bargaining agreement, but interpretation of it. And that's specific to Mr. Stouffer's complaint. Like what? Your supplemental brief just said in 14 places it might be this. It didn't point to anything that you stake and say, yeah, you're going to need to interpret the CBA to understand this. So what would we need to do? Sure. And as an aside, that's a little bit, you know, getting to the 12B6 issue, that maybe is a little bit reflective of the fact that the complaint is so vague under Tomley and Iqbal that it's tough to pin down exactly what defenses are going to be. And that's hence the maybe language. And that goes back again to, again, the 12B6 issues that we can talk about in a moment. But, you know, returning to what are the things within the CBA that are potential defenses that may be litigated? I think the biggest one, and this is in our supplemental brief, but there's an allegation in the complaint at paragraph 89 of the complaint, which is at Appendix Page 53, that talks about comparing Mr. Stouffer's discipline to substantially similar incidents. So what's a substantially similar incident under the CBA and under the demerits policy that implements the CBA? Because the demerits policy falls under the umbrella of the CBA. They work as a team. The main CBA defines major offenses. That's at Supplemental Appendix Page 80. So major offense is a defined term under the CBA, and the CBA goes on to give examples of major offenses. But no one is disputing what counts as a major offense under the CBA. It's going to be taking the language of the CBA and then applying it to a data set of other employees. Well, Your Honor, I would suggest that what is a major offense under the CBA may be at issue reading plaintiff's allegation, because when you then turn to the demerits policy, the demerits policy addresses major offenses, and those are the offenses in the demerits policy that are terminable offenses. In other words, if you do a major offense, you're terminated, which is what happened to Mr. Stouffer here. That's the demerits policy at Supplemental Appendix 170, talking about items, types of offenses that result in termination. When you terminate someone like that, do you provide a hearing or do you just sort of call them in and tell them, very sorry, you have to be terminated because? Yes, Your Honor. In answer to that question, Your Honor, yes, you absolutely tell them what happened, and that's in the record as well. That was not clear when you had asked opposing counsel about whether that existed. But that's in the Supplemental Appendix. Mr. Stouffer's termination letter is at Supplemental Appendix 175. It specifically spells out in detail the incident in which he ran through the switch, caused his train to sit on track's line for oncoming traffic, potentially would have caused a catastrophic incident if another train had been coming by. So it lays all that out. It cites to the specific rules that he's alleged to have violated. And then in further answer to your question, Your Honor, normally then, if you're provided with notice of what you did, which is what that termination letter does, normally then you proceed to, if you're challenging your termination, you go to a disciplinary hearing. That was going to be my next question. You can challenge it. Yes, Your Honor, you can challenge it. Now, Mr. Stouffer, when he was in his 30s, had a disciplinary record that should have resulted in his termination right away. That's when he entered into the last chance agreement that was bargained for with the union and with the railroad, and all three signed it. In that last chance agreement, and again, that's at Supplemental Appendix 173, in that agreement, Mr. Stouffer agreed that in exchange for foregoing a formal investigation, he would get one more chance instead of being fired. That's what the last chance agreement does. And I see, Your Honor, that I only have about 20 seconds left, so in wrap-up, I do want to emphasize that because what you look to in the collective bargaining agreement for potential defenses is specific to the complaint, that it's really a case-by-case analysis. But even if there's jurisdiction here, for all the reasons in our main brief, Hazen carries the day, and even if Hazen doesn't carry the day, the district court correctly found that it's humbly an ick ball. That standard is not met here. And I'm out of time. I'll ask you for a discreet answer to this question. What's the best example of language in the CBA or the demerits policy that you and Mr. Stouffer are construing differently that would require us to interpret the CBA and thus be barred by the Railway Labor Act? Sure. I mentioned the definition of major offenses, because those are automatically terminable. But beyond that, Your Honor, complaint paragraph 90, forced to work shifts that were not properly staffed, complaint paragraph 90 again, denied meal periods, complaint paragraph 90 again, refused headlamp batteries, all of these are within the CBA, but it's not just mere reference to the CBA. The interpretive parts, for example, forced to work shifts that were not properly staffed, the CBA includes phrases such as, quote, as business conditions may warrant, end quote, that's Supplemental Appendix 91. It talks about reduced crews being usable if there is, quote, an available, end quote, helper to be called elsewhere, end quote, when it's necessary to use regular men to fill trainman vacancies. That's Supplemental Appendix 98 and 35. But the case law, Your Honor, in some of the analogous cases talk about when you have those gray area phrases in a CBA that talk about as business conditions may warrant or reasonableness or when available, those are the sort of gray area phrases that are appropriate for the meaning to be determined in arbitration by the Board and not by the Federal Court. You see that in the Brown case and the Hogan case in our brief, for example. Thank you. Thank you, Your Honor. Mr. Segura, are any of those phrases really being disputed here? Are the parties disagreeing about as business warrants or what proper staffing is or what's a major offense? No, Your Honor, and that's the point of the issue is that we're, again, putting forth claims before this Court about disparate impact and not disparate treatment. So, again, all those interpretations of these different phrases, we're saying that the policies exist, the application of the policies happened, and that when they happened, they disproportionately impacted older employees. I'm sorry. That might get you subject matter jurisdiction, but then the problem is under Carlow, our President Carlow, from six years ago, you got a proper statistical evidence that it caused a significant age-based disparity, and you haven't done that yet. Well, Your Honor, one thing I did want to bring up when you brought up that point earlier is that when we filed this first complaint and there was a Rule 12b-6 and a 12b-1 motion, the District Court actually disagreed and said we did have enough evidence and said that disparate impact claims could proceed. We then filed a second amended complaint to deal with the disparate treatment issue to provide more information, and then the District Court actually disagreed. So that's part of the reason why we took the position that we did, because on the first time that the District Court addressed the issue, it said disparate impact claims could proceed. But again, this just goes back to this whole issue that, you know, even if we were to consider Appleby's arguments, none of these ways that they're claiming that collectively bargained policies happened comport with the law. You can't say by letter after the fact, after a CBA has been bargained for for months or maybe even years, that by signing a letter, all of a sudden that you are comporting with the Railway Labor Act, the principles of having bargained for terms and conditions of employment and so forth, because that would just contravene everything that we know about labor law, which is that both sides are there to bargain for it in good faith and equal footing. But to do it in this kind of backwards manner and to say that the disparate policy all of a sudden incorporates the collective bargaining agreement, that doesn't comply with any sort of controlling law that's before this Court or that has been briefed. Okay. Any other points you want to respond to? Yes, Your Honor. Just to reiterate that the arguments that Appleby's put forth, again, it confuses the issues that are before the Court, disparate treatment and disparate impact. And again, one of the things that we also wanted to bring up, the reason why we cited the Markovich case in our briefs was that Appleby's had brought forth these same jurisdictional arguments in another case, but they haven't raised the type of arguments that they're attempting to now, which is kind of, I don't know how you'd say it, but backdooring the viability of the dimerit policy when they haven't brought forth the issue before. So looking forth at Markovich, in which they again try to argue the same issues because it's dealing with a Union Railroad employee, they tried the same argument and the District Court denied that as well. So again, they raised upon the same issue, which is the dimerit policy was not part of the CBA and the CBA is there for a specific reason, and the Railway Labor Act recognizes that because in order to be precluded, there has to be a comprehensive framework that allows for the adjudication of all these claims within the framework of those documents. And that hasn't happened here, Your Honors. Nothing else, Your Honor? All right. We thank both sides for excellent arguments. We will take the matter under advisement.